IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

S.L., a minor, by and through her parent and
legal guardian D.L.,   Case No. 3:18 –CV-162 (Groh)

Plaintiff,

-v-

CITY HOSPITAL, INC., d/b/a,
BERKELEY MEDICAL CENTER,
A subsidiary of WEST VIRGINIA UNIVERSITY
HOSPITALS-EAST, INC., d/b/a
WV UNIVERSITY HEALTHCARE,

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1. Plaintiff S.L., a minor individual with a disability, brings this action by and through her mother and legal guardian, D. L., against Defendant Berkeley Medical Center, for violations of Title III of the Americans with Disabilities Act, 42 U.S.C § 12181 et seq. (hereafter, "ADA"); Section 504 of the Rehabilitation Act 1973, 29 U.S.C § 794 (hereafter, "Rehabilitation Act"), as well as battery and intentional infliction of emotional distress under the common law of the state of West Virginia. Plaintiff S.L. contends that Defendant has discriminated against her based on her actual and perceived disability, thus depriving her of an equal benefit of the services offered by Berkeley Medical Center. Plaintiff further contends that Defendant has unlawfully subjected her to physical restraint and forcibly administered injections and stitches without her consent or the consent of her legal guardian.

2. Plaintiff seeks a declaratory judgment that Defendant is in violation of the above federal statutes and state laws; a permanent injunction ordering Defendant to come into compliance with the law, and to institute policy changes and staff training regarding the accommodation of individuals with disabilities; and monetary damages.

## PARTIES

3. Plaintiff S.L. is a minor residing in Martinsburg, WV.

4. D.L. is S.L.'s mother and legal guardian.

5. Plaintiff S.L. is a qualified individual with a disability as defined in the ADA and the West Virginia Human Rights Act. S.L. is qualified as a person with a handicap as defined in the Rehabilitation Act.

6. City Hospital d/b/a Berkeley Medical Center (hereafter Berkeley Medical Center) is a hospital located at 500 Hospital Drive, Martinsburg, WV 25401.

7. City Hospital d/b/a Berkeley Medical Center is a subsidiary of West Virginia University Hospitals-East, Inc. d/b/a WV University Healthcare.

8. Upon information and belief, all persons referred to in the complaint as "individuals" or "staff" are employees of City Hospital, Inc. d/b/a Berkeley Medical Center.

9. Berkeley Medical Center is a public accommodation within the meaning of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181(7)(F).

10. Upon information and belief, Defendant is a recipient of federal financial assistance as defined in the Rehabilitation Act. 29 U.S.C. § 794.

11. Berkeley Medical Center is a place of public accommodation as defined by the West Virginia Human Rights Act.

## JURISDICTION & VENUE

12. This Court has jurisdiction over Plaintiff's federal law claims under 28 U.S.C. § 1331.

13. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all parties reside in this district and the events that give rise to this complaint occurred in this district.

## STATEMENT OF FACTS

14. S.L. is a minor child with a diagnosis of autism, attention deficit hyperactivity disorder, mild intellectual disability, and anxiety disorder.

15. Due to her diagnosis of autism, S.L. experiences substantial impairment in the major life activities of communicating, interacting with others, emotional self-regulation, caring for oneself, and learning.

16. In October 2016, S.L. was regularly taking Bupropion 150 mg each morning; Clonidine 0.2 mg per day; and Trazodone 100 mg each night.

17. Bupropion, also known as Wellbutrin, was used to alleviate S.L.'s anxiety disorder.

18. Clonidine is used to treat attention deficit hyperactivity disorder and anxiety disorders, among other conditions. S.L. was taking Clonidine for both attention deficit hyperactivity disorder and an anxiety disorder.

19. Trazodone is an antidepressant medication that is also used for anxiety. S.L. was taking Trazodone for insomnia.

20. S.L. has been treated for anxiety disorder by Dr. William Wear M.D. since 2013.

21. On October 12, 2016, S.L. stepped on a fence post, which pierced through the sole of her shoe and injured her right foot.

22. At that time, S.L. was thirteen years old.

23. That day, D.L. brought S.L. to the emergency room of Berkeley Medical Center.

24. D.L. and S.L. were accompanied to the emergency room by Laurie Loy, a 33-year-old cousin.

25. S.L. was evaluated by an emergency room nurse at around 6:22 PM.

26. Berkeley staff administered x-rays of S.L.'s foot, which showed no fractures.

27. Nevertheless, Berkeley staff advised D.L. that S.L.'s injury required sutures.

28. At or before that point in time, D.L. notified emergency room staff that S.L. was autistic.

29. D.L. also notified emergency room staff of the medications that S.L. took on a regular basis.

30. D.L. explained to emergency room staff that, because of S.L.'s disability, she was likely to experience severe anxiety while receiving sutures.

31.	D.L. asked emergency room staff to orally administer Ativan, a sedative, and topical Lidocaine, an anesthetic, to alleviate S.L.'s anxiety.

32.	D.L. specifically stated that S.L. would require topical Lidocaine to numb the area prior to receiving a Lidocaine injection.

33.	Upon information and belief, sedation, such as through Ativan, and topical anesthetic creams prior to injections are common accommodations for autistic individuals in situations similar to S.L.'s.

34.	At some point during this conversation, D.L. provided Berkeley staff with the contact information for S.L.'s pediatrician, Dr. William Wear, M.D.

35.	Upon information and belief, Berkeley staff did not contact Dr. Wear at any point during their encounter with S.L.

36.	Upon information and belief, if contacted, Dr. Wear would have confirmed S.L's need for the accommodations that D.L. had requested.

37.	S.L. had previously received these accommodations during a visit to the emergency room at Berkeley Medical Center on or around September 9, 2014.

38.	On or around September 9, 2014, S.L. experienced an injury at school and was taken to the Berkeley Medical Center emergency room.

39.	During that visit to Berkeley Medical Center, S.L. received care from a different doctor than the one attending to her on October 12, 2016.

40.	The doctor who treated S.L. on September 9, 2014 had explained to S.L. that he would apply anesthetic cream to numb her skin prior to giving her a shot.

41.	The doctor who treated S.L. on September 9, 2014 then administered the anaesthetic cream, waited a few minutes, and then demonstrated to S.L. that the area was numb prior to administration of a local anesthetic injection.

42.	As a result of the accommodations that she received on September 9, 2014, S.L. was able to tolerate the administration of stitches without use of restraints or heavy sedative medication.

43. Despite D.L.'s requests, shortly before 8:30 PM on October 12, 2016, a nurse approached S.L. with a tray of stitching supplies, without having previously provided S.L. with the requested Ativan or Lidocaine cream.

44. When D.L. asked the nurse about the Ativan and Lidocaine cream that she requested, the nurse responded that there was "no time" to provide those accommodations.

45. At that point, S.L. had already been in the emergency room for at least two hours.

46. There was no medical contraindication to S.L.'s receipt of Ativan or topical anesthetic cream.

47. At no point did Berkeley staff indicate that they considered the requested accommodations to be medically contraindicated.

48. Ativan and topical anesthetic cream are typically readily available at emergency room departments.

49. At no point did Berkeley staff indicate that these medications were unavailable at that time.

50. At no point prior to this point did Berkeley staff offer a different sedative or different anesthetic cream to substitute for the ones requested by D.L.

51. Upon learning that she would be receiving sutures without the accommodations she required, S.L. became upset.

52. Around this point in time, D.L. withdrew consent for treatment and stated her intent to obtain care at another hospital.

53. At around 8:28 PM, S.L. attempted to exit the patient care room and into the hallway.

54. S.L. was not, at any point that day, a threat to herself or others.

55. Rather, S.L. was attempting to avoid having sutures forcibly administered to her without appropriate accommodations.

56. Berkeley staff nevertheless continued to refuse to provide the requested accommodations.

57. Instead, several Berkeley staff attempted to physically restrain S.L.

58. Hospital video shows that at least four Berkeley staff physically pushed S.L. to the floor of the hallway.

59. At some point, S.L. rose or was lifted to her feet and pushed against the wall, while still being restrained.

60. Hospital video shows that additional Berkeley staff arrived to physically restrain S.L.

61. Hospital video further shows that numerous other individuals arrived in the hallway to watch as S.L. was pushed and restrained.

62. At some point, between five and eight Berkeley medical center staff had surrounded S.L. to physically restrain her.

63. During this process, D.L. continued to ask Berkeley staff to stop.

64. At no point did D.L. consent to the use of restraint on S.L.

65. Berkeley staff responded by telling D.L. that S.L. was "psychotic" and in need of restraint.

66. At no point that day was S.L. experiencing psychosis.

67. Berkeley staff additionally threatened to call the police, stating that the police would take D.L. to jail and take S.L. to a juvenile facility.

68. S.L. experienced significant fear and distress as a result of the restraint and the threats made by Berkeley staff.

69. S.L. experienced significant physical pain as a result of the restraints, which involved application of painful amounts of pressure on parts of S.L.'s body.

70. Throughout the time she was restrained, S.L. repeatedly struggled and asked to be released.

71. Berkeley staff continued to restrain S.L. in the hallway for several minutes.

72. At around 8:35, Berkeley staff forced S.L. onto a wheeled gurney.

73. After placing her on the gurney, Berkeley staff continued to restrain S.L. by holding her wrists and ankles.

74. S.L. was transported on the gurney, while still being restrained, to "Room 23."

75. Upon information and belief, Room 23 is a locked room designated to be used for patients in psychiatric crisis.

76. Berkeley staff continued to physically restrain S.L. while she was in Room 23.

77. At around 8:51 PM, Berkeley employee Karen Minke administered to S.L. an injection of 2 mg of Ativan via her right buttock.

78. Ativan is a sedative.

79. At around the same time, Berkeley employee Karen Minke administered to S.L. an injection of 10 mg of Geodon via her right buttock.

80. Geodon is an atypical antipsychotic medication that is often used as a "chemical restraint."

81. These injections were frightening and painful to S.L.

82. D.L. did not consent to administration of injected Ativan or Geodon.

83. Hospital records appear to reflect an additional administration of Ativan and Geodon injections around 9:00 PM.

84. Neither the restraints nor the injections were necessary to ensure S.L.'s health or safety, or the health or safety of others.

85. If S.L. had been offered the accommodations D.L. initially requested, she would not have become upset or attempted to exit into the hall.

86. Following the Ativan and Geodon injections, Berkeley staff administered a Lidocaine injection and sutures to S.L.

87. Berkeley staff continued to restrain S.L. during the administration of sutures.

88. Neither D.L. nor S.L. recall administration of Lidocaine or other anesthetic cream prior to the Lidocaine injection or sutures.

89. D.L. consented to sutures at this time only because her previous attempts at withdrawing consent had been ignored, and because hospital staff had already administered several injections without D.L.'s consent.

90. The process of restraining S.L., bringing her to another room, administering injected sedatives and antipsychotics, and administering sutures took over half an hour.

91. Upon information and belief, the process of administering oral Ativan and topical Lidocaine, followed by a Lidocaine injection and sutures, as D.L. had requested, would have taken significantly less than half an hour.

92. Additionally, the process of administering oral Ativan and topical Lidocaine, followed by a Lidocaine injection and sutures, as D.L. had requested, would have consumed significantly less staff resources than the process of restraining S.L., bringing her to another room, administering injected sedatives and antipsychotics.

93. Upon information and belief, the oral Ativan and topical Lidocaine requested by D.L. were not more costly than the injections of Ativan and Geodon.

94. S.L. was discharged from Berkeley Medical Center at around 9:30 PM.

95. On October 13, 2016, S.L. remained in bed a significant portion of the day.

96. Upon information and belief, S.L.'s fatigue on October 13, 2016, was the result of the aftereffects of the Ativan and Geodon injections, as well as the aftereffects of the stress she had experienced while restrained.

97. As a result of the restraints she experienced on October 12, 2016, S.L. experienced pain in her back, wrist, hands, and ankles for 1-2 months afterwards.

98. S.L. continues to experience anxiety and other emotional distress, including sleep disturbances, as a result of her experiences on October 12, 2016.

99. S.L. continues to experience fear of doctors as a result of her experiences on October 12, 2016.

100. On August 20, 2018, S.L. cut her finger by accident.

101. D.L. called a pediatrician that night and was advised to go to the emergency room for stitches. The pediatrician advised D.L. that stitches would help minimize scarring.

102. S.L. refused to go to the emergency room and instead bandaged the cut herself, despite the risk that doing so would leave a larger scar.

103. Upon information and belief, S.L.'s refusal to go to the emergency room on August 20, 2018, was the result of her traumatic experience on October 12, 2016.

104. S.L. will likely need to obtain services from Berkeley Medical Center in future because it is the closest hospital to both her home and school. Further, S.L.'s current primary care pediatrician William Wear, M.D. is affiliated with Berkeley Medical Center.

## COUNT I

### AMERICANS WITH DISABILITIES ACT VIOLATIONS
### 42 U.S.C. §§ 12181-12189

105. Plaintiff realleges and incorporates each and every foregoing paragraph.

106. S.L. has a disability within the meaning of 42 U.S.C. § 12102.

107. Upon information and belief, due to her diagnosis of autism and her behavior on October 12, 2016, Berkeley staff perceived S.L. as experiencing substantial impairment in the above major life activities.

108. At all times relevant to this Complaint, Berkeley Medical Center was aware that S.L. is a person with a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12102.

109. The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

110. Prohibited discrimination includes provision to "an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

111. Prohibited discrimination also includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

112. Upon information and belief, due to her diagnosis of autism and her behavior on October 12, 2016, Berkeley staff also likely perceived S.L. as experiencing substantial impairment in other major life activities, such as thinking.

113. Plaintiff specifically incorporates her statements in paragraphs 32 through 49, and statements 90-92.

114. The accommodations requested by D.L., namely administration of an oral sedative and topical anesthetic, were reasonable accommodations for the purposes of the Americans with Disabilities Act, 42 U.S.C. § 12182(b)(2)(A)(ii).

115. The accommodations requested by D.L. would not have resulted in a fundamental alteration of the nature of the services or accommodations offered by Berkeley Medical Center.

116. Berkeley Medical Center's refusal to provide the accommodations requested by D.L. resulted in S.L. being denied her right, under § 12182(b)(1)(A)(ii) of the Americans with Disabilities Act, to receive a benefit from Berkeley Medical Center's services that is equal to that afforded to other individuals.

117. Berkeley Medical Center's refusal to provide the accommodations requested by D.L. constituted a violation of Title III of the Americans with Disabilities Act.

118. Berkeley Medical Center's application of restraint and administration of Ativan and Geodon without D.L.'s consent was a direct result of its failure to provide the accommodations requested by D.L.

119. Berkeley Medical Center staff's decision to restrain S.L. and administer Ativan and Geodon injections without D.L.'s consent was based on S.L.'s disability.

120. Berkeley Medical Center staff's decision to restrain S.L. and administer Ativan and Geodon injections without D.L.'s consent was based on their perception that S.L. had a disability.

121. Berkeley Medical Center's restraint of S.L. and administration of Ativan and Geodon injections without D.L.'s consent resulted in S.L. being denied her right, under § 12182(b)(1)(A)(ii) of the Americans with Disabilities Act, to receive a benefit from Berkeley Medical Center's services that is equal to that afforded to other individuals.

122. Berkeley Medical Center's application of restraint and administration of Ativan and Geodon without D.L.'s consent constituted a violation of Title III of the Americans with Disabilities Act.

123. Berkeley Medical Center's refusal to provide the reasonable accommodations requested by D.L., its application of restraint, and its administration of Ativan and Geodon without D.L.'s consent, caused significant physical and psychological harm to S.L.

## COUNT II

### REHABILITATION ACT VIOLATIONS
### 29 U.S.C. § 794

124. Plaintiff realleges and incorporates each foregoing paragraph.

125. Upon information and belief, Defendant Berkeley Medical Center is a recipient of federal financial assistance as defined in the Rehabilitation Act. 29 U.S.C. § 794.

126. Defendant therefore must ensure that no qualified individual with a disability, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

127. Defendant also must not, under Rehabilitation Act regulations, "afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 45 C.F.R. § 84.4(b)(ii).

128. Defendant subjected Plaintiff S.L. to discrimination in its programs and activities by denying her requested accommodations and therefore not providing her with an equal opportunity to obtain the same result, or gain the same benefit, from their services as a person who is not disabled.

## COUNT III

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

128. Defendant realleges and incorporates each foregoing paragraph.

129. Under West Virginia law, "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Syllabus Point 6, Harless v. First Nat. Bank in Fairmont, 169 W. Va. 673, 289 S.E.2d 692 (1982).

130. Defendant's reckless and intentional behavior caused plaintiff to suffer from both emotional distress and bodily harm.

131. Defendant acted both intentionally and recklessly by using no less than four members of the hospital staff to push the plaintiff against the wall and prevent her from exiting the hospital without cause.

133. Defendant caused both emotional and bodily harm to the plaintiff by unnecessarily and recklessly restraining the plaintiff on a gurney.

132. Defendant caused both emotional and bodily harm to the plaintiff by injecting her with medication after her legal guardian had withdrawn consent for medical treatment.

133. Defendant caused the plaintiff emotional distress by threatening to call the police and have her locked up in a juvenile facility.

134. Plaintiff has suffered serious physical and emotional harm resulting from defendant's failure to provide appropriate accommodations, use of excessive force, unnecessary restraint and medical treatment without the consent of the legal guardian as outlined in paragraphs 94 to 98.

## COUNT IV

## BATTERY

135. Defendant realleges and incorporates each foregoing paragraph.

136. Defendant committed a battery against the plaintiff when four hospital staff pushed the plaintiff onto the floor.

137. Defendant committed battery against the plaintiff when they forcibly restrained her on a hospital gurney.

138. Defendant committed a battery against the plaintiff when they injected her with medications after her legal guardian has withdrawn consent to provide medical treatment.

## PRAYER FOR RELIEF

Therefore, Plaintiff respectfully requests that this Court:

a. Issue a permanent injunction against Defendant, its agents, servants, and employees, and all persons in active concert with Defendant,

   (1) To take all steps necessary to ensure that Plaintiff will receive reasonable accommodations in future visits to the hospital, including instituting policy changes and conducting staff training regarding serving individuals with a diagnosis of autism or other developmental disabilities;

   (2) To take all steps necessary to ensure that Plaintiff is not subjected to physical or chemical restraints in future visits to the hospital, including instituting policy changes and conducting staff training regarding serving individuals with a diagnosis of autism or other developmental disabilities; and

      (3) to refrain from taking any action that discriminates against Plaintiff in violation of the ADA and the Rehabilitation Act.

b. Enter a declaratory judgment, specifying Defendant's statutory violations and declaring the rights of the Plaintiff as to the Defendant's programs, services, and activities.

c. Find that Plaintiff is the prevailing party in this case and award compensatory damages, punitive damages, and restitution along with any attorney fees, costs, and expenses; and

d. Order such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

## JURY DEMAND

Plaintiff requests trial by jury.

Respectfully submitted this \_\_9th\_\_ day of November 2018,

Date: 11/9/2018

Signature: *[signature]*
Shawna White
BAR No. 10893
Disability Rights of West Virginia
1207 Quarrier St.
Charleston, WV 25301

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**S.L., a minor, by and through her parent and
Legal guardian D.L.,**

Case No. 3:18-cv-00162

Plaintiff,

-v-

**CITY HOSPITAL, INC., d/b/a,
BERKELEY MEDICAL CENTER,
A subsidiary of WEST VIRGINIA UNIVERSITY
HOSPITALS-EAST, INC., d/b/a
WV UNIVERSITY HEALTHCARE**

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2018, I have mailed the attached First Amended Complaint, by United States Postal Service, the documents to the following:

Robert O'Neal
West Virginia United Health Systems
One Medical Center Dr.
P.O. Box 8059
Morgantown, WV 26506

Anna Buchanan
Berkeley Medical Center
2000 Foundation Way, Suite 2310
Martinsburg, WV 25401

Christine Volglienti
WVU Hospitals, Inc.
1238 Suncrest Towne Center
Morgantown, WV 26505

Anthony P. Zelenka
Berkeley Medical Center
2500 Hospital Drive
Martinsburg, WV 25401

Joshua K. Boggs
Associate Litigation Counsel
West Virginia United Health System
1238 Suncrest Towne Center Drive
Morgantown, WV 26505

_/s/ Shawna P. White_
Shawna White   Bar No. 10893
Disability Rights of WV
1207 Quarrier Street
Litton Building, Suite 400
Charleston, WV 25301
(304) 346-0847