IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

S.L., a minor, by and through her
parent and legal guardian D.L.,

    Plaintiff,

-v-                                                                               Case No. 3:18 –CV-162 (Groh)

CITY HOSPITAL, INC., d/b/a,
BERKELEY MEDICAL CENTER,
A subsidiary of WEST VIRGINIA UNIVERSITY
HOSPITALS-EAST, INC., d/b/a
WV UNIVERSITY HEALTHCARE;
BRANDT WILLIAMSON, M.D.;
MISTY HUNSADER, PA-C;
SMOKY MOUNTAIN EMERGENCY
SERVICES, INC.; and
HEALTH CARE ALLIANCE, INC.,

    Defendants.

## THIRD AMENDED COMPLAINT

### INTRODUCTION

    1.    Plaintiff S.L., a minor individual with a disability, brings this action by and through her mother and legal guardian, D.L., against defendants for violations of Title III of the Americans with Disabilities Act, 42 U.S.C § 12181 et seq. (hereafter, "ADA"); Section 504 of the Rehabilitation Act 1973, 29 U.S.C § 794 (hereafter, "Rehabilitation Act"); and the Medical Professional Liability Act ("MPLA") W. Va. Code § 55-7B-1 *et seq*.

    2.    D.L. contends that defendants have discriminated against S.L. based on her actual and perceived disability, thus depriving S.L. of an equal benefit of the services offered by defendants and violating the foregoing Federal and West Virginia State laws. S.L. further contends that defendants' acts and omissions unlawfully subjected S.L. to physical restraint and forcible administration of injections and stitches without her consent or the consent of her legal guardian. Finally, plaintiff

contends that the acts and omissions of the defendants violated the applicable standards of care under the MPLA.

3. Plaintiff seeks: (a) a declaratory judgment that defendants are in violation of the above federal and state statutes prohibiting discrimination against persons with disabilities; (b) a permanent injunction ordering defendant to come into compliance with federal and state law and to institute policy changes and staff training prohibiting discrimination against and accommodation to individuals with disabilities;© monetary damages as set forth below under the state claims; and (d) attorney fees and costs under the ADA and the Rehabilitation Act.

## PARTIES

4. S.L. is a minor residing in Martinsburg, WV.

5. D.L. is S.L.'s mother and legal guardian and a resident of Martinsburg, WV.

6. S.L. is an individual with a disability or handicap as defined in the ADA and the Rehabilitation Act.

7. City Hospital, Inc. d/b/a Berkeley Medical Center ("BMC") is a hospital located at 500 Hospital Drive, Martinsburg, WV 25401. It is a subsidiary of West Virginia University Hospitals-East, Inc. d/b/a WV University Healthcare ("WVH"). Defendants BMC and WVH are hereafter referred to collectively as the "BMC defendants." They are sued for their liability in *respondeat superior* for the acts and omissions of their employees at BMC.

8. The BMC defendants and the Emergency Department ("ED") where Dr. Williamson and PA-C Hunsader worked are "places of public accommodations" within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(F).

9. Upon information and belief, the BMC and ED defendants are recipients of federal financial assistance as defined in the Rehabilitation Act. 29 U.S.C. § 794 and in the relevant regulations and are therefore subject to the provisions of said Act.

10. Dr. Brandt Williamson worked, at all time relevant herein, as a physician in the ED at BMC.

11. PA-C Misty Hunsader worked, at all times relevant herein, as a physician's assistant in the ED at BMC.

12. Dr. Williamson and PA-C Hunsader are sometimes referred to collectively as ED staff.

13. At the time of the events that gave rise to this civil action, defendants Williamson and Hunsader were employed by Salutis Emergency Specialists, PLLC ("Salutis") pursuant to a contract between Salutis and BMC. However, on information and belief, Salutis is no longer in business and plaintiff's claims against Salutis in *respondeat superior* are therefore asserted against its successors in interest.

14. Defendant Smoky Mountain Emergency Services, Inc., ("Smoky Mountain") is a West Virginia Corporation with its principle place of business in Knoxville, Tennessee. It is doing business in the Northern District of West Virginia and is, on information and belief, a successor in interest to Salutis.

15. Defendant Health Care Alliance, Inc. ("Alliance") is a West Virginia corporation with its principle place of business in Knoxville, Tennessee. It is doing business in the Northern District of West Virginia and is, on information and belief, a successor in interest to Salutis.

16. Smoky Mountain and Alliance are and properly sued in *respondeat superior* for the acts and omissions of Dr. Williamson and/or PA-C Hunsader. Dr. Williamson, PA-C Hunsader, Smoky Mountain and Alliance are referred to collectively as the ED defendants.

17. Health Care Alliance, Inc. ("Alliance") are the successors in interest to Salutis and properly sued in *respondeat superior* for the acts and omissions of Dr. Williamson and/or PA-C Hunsader. Dr. Williamson, PA-C Hunsader, Smoky Mountain and Alliance are referred to collectively as the ED defendants or ED staff.

18. Upon information and belief, all individuals referred to as "individuals" or as "staff" except for Dr. Williamson and PA-C Hunsader are employees of the BMC defendants.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and over the non-federal claims pursuant to the pendent jurisdiction of this Court.

20. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all parties, on information and belief, reside in this district and/or because the events that give rise to this complaint occurred in this district.

## STATEMENT OF FACTS

21. S.L. is a minor child who has been diagnosed with autism, attention deficit hyperactivity disorder, mild intellectual disability, and anxiety disorder. S.L. was diagnosed with autism in approximately 2012 and with other medical conditions since at least November 2013.

22. Due to her diagnosis of autism and other conditions, S.L. experiences substantial impairments in major life activities including, but not limited to, communicating, interacting with others, emotional self-regulation, caring for oneself, and learning. Upon information and belief, due

4

to her diagnosis of autism and her behavior on October 12, 2016, BMC and/or ED staff likely perceived S.L. as experiencing substantial impairment in other major life activities, such as thinking.

23. In October 2016, S.L. was regularly taking Bupropion 150 mg each morning; Clonidine 0.2 mg per day; and Trazodone 100 mg each night. Bupropion, also known as Wellbutrin, was used to alleviate S.L.'s anxiety disorder. Clonidine is used to treat attention deficit hyperactivity disorder and anxiety disorders, among other conditions. S.L. was taking Clonidine for both attention deficit hyperactivity disorder and an anxiety disorder. Trazodone an antidepressant medication that is also used for anxiety. S.L. was taking Trazodone for insomnia.

24. On October 12, 2016, S.L., then age thirteen (13), stepped on a fence post, that pierced through the sole of her shoe and injured her right foot.

25. S.L. and D.L. arrived at the ED at approximately 6:05 PM.

26. After S.L. and D.L. arrived in the ED, D.L. informed the nurse at the desk and triage, the attending nurse, and the attending PA-C that S.L. was autistic and because of S.L.'s disability, S.L. was likely to experience severe anxiety while receiving sutures.

27. BMC and/or ED staff requested x-rays of S.L.'s foot, which showed no fractures or other finding requiring immediate treatment.

28. BMC and/or ED staff advised D.L. that S.L.'s injury required sutures.

29. D.L. specifically requested that S.L. be given oral Ativan for her anxiety and that topical Lidocaine be placed on the area of the cut to numb the foot before it was stitched.

30. There was no medical contraindication to S.L.'s receipt of oral Ativan or topical anesthetic cream.

31. Upon information and belief, sedation, such as through oral Ativan, and topical anesthetic creams prior to injections are common accommodations for autistic individuals in situations similar to S.L.'s.

32. At some point during this conversation, D.L. provided BMC and/or ED staff with the contact information for S.L.'s pediatrician, Dr. William Wear, in case they needed to consult him.

33. Upon information and belief, BMC staff did not contact Dr. Wear at any point during their encounter with S.L. Upon information and belief, if contacted, Dr. Wear would have confirmed S.L's need for the accommodations that D.L. had requested.

34. S.L. had previously received similar accommodations during a visit to the ED at BMC on or around September 9, 2014, after S.L. experienced an injury at school.

35. During the September 9, 2014, visit to BMC, S.L. received care from a different doctor, not from Dr. Williamson.

36. The doctor who treated S.L. on September 9, 2014, had explained to S.L. that he would apply anesthetic cream to numb her skin prior to giving her a shot.

37. The doctor who treated S.L. on September 9, 2014, then administered the anaesthetic cream, waited a few minutes, and then demonstrated to S.L. that the area was numb prior to administration of a local anesthetic injection.

38. As a result of the accommodations that she received on September 9, 2014, S.L. was able to tolerate the administration of stitches without use of restraints or heavy sedative medication.

39. Despite D.L.'s requests, shortly before 8:30 PM on October 12, 2016, a nurse approached S.L. with a tray of stitching supplies, without having previously provided S.L. with the requested oral Ativan or Lidocaine cream.

40. When D.L. asked the nurse about the oral Ativan and Lidocaine cream that she requested, the nurse responded that there was "no time" to provide those accommodations.

41. At that point, S.L. had already been in the ED for at least two (2) hours.

42. At no point did BMC staff indicate that they considered the requested accommodations to be medically contraindicated.

43. Ativan and topical anesthetic cream are typically readily available at emergency room departments.

44. At no point did BMC staff indicate that these medications were unavailable at that time.

45. At no point prior to this did BMC and/or ED staff offer a different sedative or different anesthetic cream to substitute for the ones requested by D.L.

46. Upon learning that she would be receiving sutures without the accommodations she required, S.L. became upset.

47. Around this point in time, D.L. withdrew consent for treatment and stated her intent to obtain care at another hospital.

48. At around 8:28 PM, S.L. attempted to exit the patient care room and head into the hallway.

49. S.L. was not, at any point that day, a threat to herself or others.

50. Rather, S.L. was attempting to avoid having sutures forcibly administered to her without appropriate accommodations.

51. BMC and ED staff nevertheless continued to refuse to provide the requested accommodations.

52. BMC and ED staff failed to allow D.L. and S.L. to leave and/or failed to otherwise accommodate S.L. Instead, BMC and/or ED staff physically restrained S.L. trying to prevent her from leaving the room she had been placed in and from leaving the ED. Hospital video shows that BMC and/or ED staff forced S.L. to the floor of the hallway, then pinned her and restrained her against the wall for several minutes, forced her to the floor again and then finally forced her onto a hospital gurney against her will.

53. Hospital video further shows that additional BMC staff arrived to physically restrain S.L.

54. Hospital video further shows that numerous other individuals arrived in the hallway to watch as S.L. was pushed and restrained.

55. At some point, between five and eight BMC staff had surrounded S.L., a thirteen year old child, to physically restrain her.

56. During this process, D.L. continued to ask BMC and ED staff to stop.

57. At no point did D.L. consent to the use of restraint on S.L.

58. BMC and/or ED staff responded by telling D.L. that S.L. was "psychotic" and in need of restraint.

59. At no point that day was S.L. experiencing psychosis.

60. BMC and/or ED staff additionally threatened to call the police, stating that the police would take D.L. to jail and take S.L. to a juvenile facility.

61. Throughout the time she was restrained, S.L. repeatedly struggled and asked to be released.

62. BMC and/or ED staff continued to restrain S.L. in the hallway for several minutes.

63. At around 8:35 PM., BMC staff forced S.L. onto a wheeled gurney.

64. After placing her on the gurney, BMC staff continued to restrain S.L. by holding her wrists and ankles.

65. S.L. was transported on the gurney, while still being restrained, to "Room 23."

66. Upon information and belief, Room 23 is a locked room designated to be used for patients in psychiatric crisis.

67. BMC staff continued to physically restrain S.L. while she was in Room 23.

68. S.L. experienced significant physical pain and emotional trauma as a result of the foregoing conduct of BMC and ED staff. She experienced significant physical pain as a result of the restraints, which involved application of painful amounts of pressure on parts of S.L.'s body and she experienced fear and distress as a result of the restraints and the threats made by BMC and/or ED staff.

69. At around 8:51 PM, BMC employee Karen Minke administered to S.L. an injection of 2 mg of Ativan via her right buttock.

70. At around the same time, BMC employee Karen Minke administered to S.L. an injection of 10 mg of Geodon via her right buttock. Geodon is an atypical antipsychotic medication that is often used as a "chemical restraint."

71. These injections were frightening and painful to S.L.

72. D.L. did not consent to administration of injected Ativan or Geodon.

73. Neither the restraints nor the injections were necessary to ensure S.L.'s health or safety, or the health or safety of others.

74. If S.L. had been provided the accommodations D.L. initially requested, S.L. would not have become upset or attempted to exit ED.

75. Following the Ativan and Geodon injections, BMC staff administered a Lidocaine injection and sutures to S.L. foot.

76. BMC and/or ED staff continued to restrain S.L. during the administration of sutures.

77. Neither D.L. nor S.L. recall administration of Lidocaine or other anesthetic cream prior to the Lidocaine injection or sutures.

78. D.L. consented to sutures at this time only because her previous attempts at withdrawing consent had been ignored, and because hospital staff had already administered several injections without D.L.'s consent.

79. The process of restraining S.L., bringing her to another room, administering injected sedatives and antipsychotics, and administering sutures took over half an hour.

80. Upon information and belief, the process of administering oral Ativan and topical Lidocaine, followed by a Lidocaine injection and sutures, as D.L. had requested, would have taken significantly less than half an hour.

81. Additionally, the process of administering oral Ativan and topical Lidocaine, followed by a Lidocaine injection and sutures, as D.L. had requested, would have consumed significantly less staff resources than the process of restraining S.L., bringing her to another room, administering injected sedatives and antipsychotics.

82. Upon information and belief, the oral Ativan and topical Lidocaine requested by D.L. were not more costly than the injections of Ativan and Geodon.

83. S.L. was discharged from BMC at around 9:30 PM.

84. On October 13, 2016, S.L. remained in bed a significant portion of the day.

85. Upon information and belief, S.L.'s fatigue on October 13, 2016, was the result of the aftereffects of the Ativan and Geodon injections, as well as the aftereffects of the stress and distress she had experienced while being restrained by BMC and/or ED staff.

86. As a result of the restraints and treatment she experienced at BMC and its ED on October 12, 2016, S.L. experienced pain in her back, wrist, hands, and ankles for 1-2 months after the she was pushed to the floor, held against the wall, and then lifted and restrained on the hospital gurney.

87. S.L. has experienced and continues to experience anxiety, posttraumatic stress disorder ("PTSD") and other emotional distress, including sleep disturbances, as a result of her experiences on October 12, 2016.

88. S.L. continues to experience fear of doctors as a result of her experiences at BMC and its ED on October 12, 2016.

89. On August 20, 2018, S.L. cut her finger by accident.

90. D.L. called a pediatrician that night and was advised to go to the emergency room for stitches. The pediatrician advised D.L. that stitches would help minimize scarring.

91. S.L. refused to go to the emergency room and instead bandaged the cut herself, despite the risk that doing so would leave a larger scar.

92. Upon information and belief, S.L.'s refusal to go to the emergency room on August 20, 2018, was the result of her traumatic experience on October 12, 2016 at BMC and its ED.

93. S.L. will likely need to obtain services from BMC and/or the ED staff in the future because it is the closest hospital to both her home and school.

## FIRST CAUSE OF ACTION
### (Americans With Disabilities Act - BMC and ED Defendants)

94. S.L. has a disability within the meaning of the ADA, 42 U.S.C. § 12102.

95. At all times relevant to this Complaint, agents and employees of BMC as well as defendants Williamson and Hunsader, were aware and/or should have been aware that S.L. is a person with a disability within the meaning of the ADA, 42 U.S.C. § 12102.

96. The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

97. Prohibited discrimination under the ADA includes the provision to "an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

98. Prohibited discrimination also includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

99. The accommodations requested by D.L. for S.L., namely administration of an oral sedative and topical anesthetic, were reasonable accommodations for the purposes of the Americans with Disabilities Act, 42 U.S.C. § 12182(b)(2)(A)(ii).

100. The accommodations requested by D.L. would not have resulted in a fundamental alteration of the nature of the services or accommodations offered by the defendants. Nor would they have been a hardship to the defendants.

101. The refusal and failure of the defendants, their agents and employees, to provide the accommodations requested by D.L. resulted in S.L. being denied her right, under §12182(b)(1)(A)(ii) of the ADA, to receive a benefit from the services of BMC and/or the ED staff that is equal to that afforded to other individuals.

102. The request for the administration of oral Ativan and topical Lidocaine was a reasonable accommodations for the care and treatment of an individual with S.L.'s disability and the defendants' denial of that accommodation violated S.L's rights under the ADA.

103. Subsequently, when S.L. became upset she requested and/or attempted to leave BMC and the ED. Defendants' refusal to let her leave violated the ADA by discriminating against her and/or denying her a reasonable accommodation.

104. By thereafter restraining S.L. and failing to comply with the requested accommodation, BMC and/or ED staff violated S.L.'s rights under Title III of the ADA.

105. The application of restraint and the administration of Ativan and Geodon injections without D.L.'s consent was a direct result of the failure of BMC and/or ED staff to provide the accommodations requested by D.L. on behalf of S.L.

106. The decision of BMC and/or ED staff to restrain S.L. and administer Ativan and Geodon injections without D.L.'s consent was an unlawful reaction to S.L.'s disability and constituted discrimination in violation of Title III of the ADA.

107. The decision to restrain S.L. and administer Ativan and Geodon injections without D.L.'s consent was based on the perception by the BMC and/or ED staff that S.L. had a disability.

108. The restraint of S.L. and administration of Ativan and Geodon injections by the BMC and/or ED staff without D.L.'s consent resulted in S.L. being denied her right, under § 12182(b)(1)(A)(ii) of the ADA, to receive a benefit from BMC's services that is equal to that afforded to other individuals.

109. The use of restraint and administration of Ativan and Geodon injections by BMC and/or ED staff without D.L.'s consent constituted a violation of Title III of the ADA and constituted discrimination based on S.L.'s disability.

110. The failure and refusal of the BMC and/or ED staff to provide the reasonable accommodations requested by D.L., their application of restraint, and their administration of Ativan and Geodon injections without D.L.'s consent, caused significant physical and psychological harm to S.L. as set forth above.

111. The failure of the BMC and/or ED staff to provide D.L.'s requested accommodation and their resort to restraint and forcible administration of medication were, on information and belief, the result of inadequate training of staff to address the accommodations necessary in responding to the needs of individuals with disabilities such as S.L.

112. D.L. is entitled to a declaratory judgment that the defendants' acts and omissions violated the ADA which prohibits discrimination against persons with disabilities and to a permanent

injunction ordering the defendants to come into compliance with the ADA and to institute policy changes and staff training to ensure that their respective staffs understand and implement the requirements of the ADA.

113. D.L. is also entitled to an order awarding her attorneys their reasonable attorney fees and costs for their work in this case.

## SECOND CAUSE OF ACTION
**(Rehabilitation Act - BMC and ED Defendants)**

114. Upon information and belief, BMC is a recipient of federal financial assistance and therefore required to comply with the Rehabilitation Act and to pay damages, attorney fees, and costs.

115. Upon information and belief, the ED staff and Salutis were, at all times relevant herein, recipients of federal financial assistance. Therefore, the ED staff and the successors in interest to Salutis are required to comply with the Rehabilitation Act, are liable in damages for violations of that Act.

116. Defendants therefore must ensure that no qualified individual with a disability, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

117. Defendants subjected plaintiff S.L. to discrimination in its programs by refusing to provide reasonable accommodations so that she could reasonably be provided with BMC's services.

118. Defendants violated the Rehabilitation Act because their acts and omissions were discriminatory in violation of 45 C.F.R. §84.4(b), particularly § 84.4(b)(ii), which prohibits a recipient

15

of federal funds from affording "a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others."

119. Defendants subjected plaintiff S.L. to discrimination in its programs and activities prohibited by the Rehabilitation Act by not allowing S.L. to leave, denying her requested accommodations and subjecting her to inappropriate chemical and physical restraints, therefore not providing her with an equal opportunity to obtain the same result, or gain the same benefit, from their services as a person who is not disabled.

120. The restraint of S.L. and the administration of Ativan and Geodon injections, by BMC and/or the ED defendants without D.L.'s consent also resulted in S.L. being denied her right, under the Rehabilitation Act, to receive a benefit from BMC's services that is equal to that afforded to other individuals.

121. As a direct and proximate result of the violations of the Rehabilitation Act by BMC and/or the ED defendants, S.L. is entitled to compensatory damages in an amount to be determined by the jury and to an award of attorney fees and costs.

### THIRD CAUSE OF ACTION
### (MPLA - All Defendants)

122. Defendants, their agents and employees, are health care providers within the meaning of W. Va. Code § 55-7B-2 (g) and were acting as health care providers in their care and treatment of S.L. at BMC, including but not limited to, the BMC ED on October 12, 2016.

123. In their care and treatment of S.L. on October 12, 2016, the defendants, their agents and employees, failed to exercise the degree of care, skill and required and/or expected of reasonable, prudent health care providers acting in the same or similar circumstances including, but not limited

to, their failure to address the concerns of D.L. with regard to the proper treatment of S.L. given her age and disabilities, their physical and chemical restraint of S.L., their failure to allow D.L. and S.L. to leave BMC and its E.D., their resort to physical force to prevent them from doing so, and their refusal to allow D.L. to withdraw the request for treatment on behalf of S.L.

124. Defendants, their agents and employees, failed to exercise the degree of care, skill and learning in training their agents and employees including, but not limited to, the appropriate indications for the physical and/or chemical restraint of patients with disabilities such as those of S.L., the use of non-coercive approaches to such patients and the rights of patients and their parents refuse treatment.

125. As a direct and proximate result of the failure of defendants to meet the standard of care in their care and treatment of S.L. on October 12, 2016, S.L. suffered severe and permanent injury including the emotional distress and trauma suffered by her on October 12, 2016, and the continuing psychological distress and mental anguish, most notably the cluster of behavioral and mental symptoms known as PTSD as well as related distress.

126. Plaintiff S.L. has and will continue to suffer because of her permanent injury, including past and future medical expenses and past and future pain and suffering.

127. Defendants are liable to S.L. for past and future medical and/or psychological expenses in an amount to be proven to a jury.

128. Defendants are liable to D.L. for past and future Pain and suffering and emotional distress to S.L. in an amount to be determined by a jury.

129. Defendants caused both emotional and bodily harm to S.L. by injecting her with medications after her legal guardian had withdrawn consent for medical treatment.

130. The actions of the defendants were willful, wanton and/or undertaken in direct disregard for the rights and sensibilities of S.L. and of other similarly situated individuals entitling the plaintiff to punitive damages in an amount to be determined by the jury.

### FOURTH CAUSE OF ACTION
### (*Respondeat Superior* - BMC, Smoky Mountain and Alliance)

131. BMC, Smoky Mountain and Alliance are sued in *respondeat superior* for compensatory damages for the conduct of their employees under the Rehabilitation Act and for compensatory and punitive damages for the tortious conduct of their employees under the MPLA. They are also sued under the ADA and Rehabilitation Act for declaratory, injunctive relief, attorney fees and costs.

### PRAYER FOR RELIEF

Therefore, plaintiff respectfully requests that:

a. This Court issue a declaratory judgment:

   i. Stating that the acts and omissions of the defendants violated the ADA and the Rehabilitation Act that prohibit discrimination against persons with disabilities; and

   ii. Declaring the rights of plaintiff as to the defendants' programs, services, and activities.

b. This Court issue a permanent injunction ordering:

   i. That defendants come into compliance with the ADA and the Rehabilitation Act instituting policy changes and staff training reasonably necessary to ensure that the BMC and ED staff do not replicate their unlawful behavior with other individuals with autism or related disabilities; and

   ii. That the defendants refrain from taking any action that discriminates against the plaintiff and others with similar disabilities in violation of the ADA and the Rehabilitation Act.

    c.    This case be tried before a jury and that the jury award plaintiff damages under the MPLA including compensatory and punitive damages;

    d.    This Court award attorney fees and costs to plaintiff under the ADA and the Rehabilitation Act; and

    e.    This Court order such other and further relief, at law or in equity, to which plaintiff may be justly entitled.

## JURY DEMAND

Plaintiff requests trial by jury.

                      PLAINTIFF,
                      BY COUNSEL

/s/ *Allan N. Karlin*
ALLAN N. KARLIN, WV BAR # 1953
JANE E. PEAK, WV BAR #7213
ALLAN N. KARLIN & ASSOCIATES PLLC
174 CHANCERY ROW
MORGANTOWN, WV 26505
304-296-8266

/s/ *Samantha Crane*
SAMANTHA CRANE, DC BAR # 1000447
AUTISTIC SELF ADVOCACY NETWORK
1010 VERMONT AVENUE, STE 618
WASHINGTON, DC 20005

/s/ *Shawna White*
SHAWNA WHITE, WV BAR # 10893
DISABILITY RIGHTS OF WEST VIRGINIA
1207 QUARRIER STREET
CHARLESTON, WV 25301