IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

S.L., A MINOR, BY AND THROUGH
HER PARENT AND LEGAL GUARDIAN D.L.

                      Plaintiff,

v.                                                  CIVIL ACTION NO. 3:18-CV-162
                                                          (Groh)

CITY HOSPITAL, INC., d/b/a,
BERKELEY MEDICAL CENTER,
A subsidiary of WEST VIRGINIA UNIVERSITY
HOSPITALS-EAST, INC., d/b/a
WV UNIVERSITY HEALTHCARE;
BRANDT WILLIAMSON, M.D.;
MISTY HUNSADER, PA-C;
SMOKY MOUNTAIN EMERGENCY
SERVICES, INC.; and
HEALTH CARE ALLIANCE, INC.,

                      Defendant.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO BMC'S MOTION TO DISMISS PLAINTIFF'S FIRST AND RELATED PARTS OF THE FOURTH CAUSE OF ACTION**

      NOW COMES the Plaintiff, S.L., a minor, by and through her parent and legal guardian, D.L., by and through her counsel, hereby submits this memorandum in opposition to dismiss Plaintiff's first and related parts of the fourth cause of action for lack of standing. Plaintiff's first cause of action asserts claims under Title III of the Americans with Disabilities Act. As the additional facts in Plaintiff's proposed Fourth Amended Complaint set forth, Plaintiff is likely to suffer continued harm if BMC does not alter its policies and practices to ensure that it will no longer discriminate against autistic patients or those with other developmental disabilities at BMC, including in its Emergency Department.

1

## I. PRELIMINARY STATEMENT AND FACTUAL BACKGROUND

S.L., an autistic teenager, visited Berkeley Medical Center ("BMC") on October 12, 2016, seeking medical care for an injury to her foot. Fourth Am. Compl. ¶¶ 24, 25. D.L. informed the nurse at the desk and triage, the attending nurse, and the attending PA-C, defendant Misty Hunsader, that S.L. was autistic and because of S.L.'s disability, S.L. was likely to experience severe anxiety upon seeing needles and while receiving sutures. *Id.* ¶ 26.

As a result of her autism and related disabilities, S.L. could not tolerate needles, much less the suture procedure, without basic disability accommodations, such as anxiety management and topical anesthetic. Fourth Am. Compl. ¶¶ 21-23, 26. BMC staff failed to provide these accommodations. *Id.*, ¶¶ 40-46. When S.L. became distressed and upset at the sight of needles and at the idea of receiving sutures without the accommodations she needed, her mother D.L. withdrew consent for treatment and stated her intent to obtain care at another hospital. Fourth Am. Compl. ¶¶ 47, 48. BMC refused to permit S.L. or her mother to leave and, in cooperation with employees of the ED Defendants, instead sent numerous staff members to forcibly restrain S.L. and administer injectable antipsychotic medications against S.L.'s will and without her or D.L.'s consent, before ultimately administering sutures to S.L.'s foot. *Id.* ¶¶ 49-83. Due to the contemporaneous statements of BMC staff, S.L. and her mother reasonably believe that BMC's and the ED's actions in detaining and restraining S.L. were based on discriminatory and stereotypical attitudes toward people with disabilities like S.L., and that a person without disabilities expressing similar distress would not have been forcibly restrained.

Following the 2016 incident, S.L. has been deterred from seeking treatment at the BMC ED because of her fear of being once again subjected to forcible medication and restraint. Fourth

Am. Compl. at ¶¶ 87-93. This fear is justified by BMC's failure to alter its relevant policies or trainings in response to the traumatic event. Indeed, professionals who work in the Emergency Department have stated that they viewed S.L.'s treatment on that date as appropriate. *Id.* at 106-107. S.L. 's inability to return to the BMC ED has resulted in continuing harm in the form of inability to receive appropriate medical treatment. *Id.* at ¶¶ 88-97. S.L. seeks injunctive relief requiring BMC to modify its practices and trainings so that she once again has the opportunity to seek care at BMC, her closest hospital. *Id.* at 128.

## II. APPLICABLE LAW

### A. <u>Federal Rule Of Civil Procedure 12(b)(6)</u>

In order to withstand a 12(b)(6) motion, a plaintiff's factual allegations must raise her right to relief above the speculative level. *Bell Atlantic v. Twombly*, 127 S.Ct. 1955, 1965 (2007). To do so, plaintiffs must "allege facts sufficient to state all the elements of [their] claim." *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) (quoting *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003)). When ruling on a 12(b)(6) motion, a court must assume that a plaintiff's factual allegations are true and view all allegations in the light most favorable to the plaintiff. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999).

### B. Standing

To satisfy the requirements of Article III, Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. *Baker v. Carr*, 369 U.S. 186, 204 (1962) quoted in *Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S. Ct. 1660, 1665 (1983).

Standing to seek injunctive relief requires the plaintiff to show not only past illegal conduct but also "continuing, present adverse effects." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564, 112 S. Ct. 2130, 2138 (1992) (quoting *Lyons*, 461 U.S. at 102).

Although the *Lyons* standard appears stringent at first, courts implementing *Lyons* in the context of the ADA have found standing in a variety of circumstances. In the context of the ADA, an interest in accessing a particular public accommodation, without discrimination, can alone constitute a "personal stake," even in the absence of a concrete future plan to visit the public accommodation. *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 456 (4th Cir. 2017) (holding that a plaintiff had standing to pursue injunctive relief against an inaccessible rest stop based on the likelihood that the plaintiff would travel past the rest stop in the future). Indeed, the Fourth Circuit has recognized standing for injunctive relief under the ADA when it is merely "plausible" that the plaintiff will return to a place of public accommodation and again face discrimination. *Id.* at 456.

### III. ARGUMENT

Plaintiff has moved to amend her complaint. (Doc. 173.) Plaintiff's proposed Fourth Amended Complaint has been updated to incorporate additional facts related to her standing under Title III of the ADA, including some facts that came to light during the discovery process. Read in the light most favorable to Plaintiff, these updated facts meet Plaintiff's burden of pleading that 1) in 2016, BMC lacked appropriate policies that could have prevented S.L.'s traumatic experience in the ED; 2) BMC has not meaningfully altered its policies or training since 2016; 3) S.L. is reasonably likely to need emergency medical care at BMC in the future; and 4) in the event that she needs medical care, BMC's failure to alter its policies will cause S.L.

4

harm - either by exposing her to an unreasonable risk of discrimination, or by deterring her from obtaining necessary medical care. Fourth Am. Compl. ¶¶ 99-109. These facts more than adequately show that S.L. has a "personal stake" in ensuring that BMC alters its policies and practices. *Nanni,* 878 F.3d at 456.

S.L.'s fear of needles, autism, and PTSD will not go away. They will always require accommodation under the ADA if she seeks emergency medical care. If no policy and training is in place on how to serve the needs of, and avoid unnecessarily agitating, autistic patients, then the harm S.L. suffered will be repeated. The fact that S.L. will have to return to BMC for emergent treatment and that BMC has implemented no adequate policy changes or training to address the cause of S.L.'s harm meets the "real and immediate" threat requirement for standing in Title III of the ADA. In other words, the assault suffered by S.L. at the hands of BMC's staff and providers is capable of repetition, yet will evade review if not addressed in this case.

### A. BMC's failure to accommodate S.L. is the result of its ongoing failure to adopt appropriate policies and training for the purpose of treating and providing reasonable accommodations to individuals with autism or other developmental disabilities.

A place of public accommodation discriminates against individuals with disabilities when it fails to make "reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." Americans with Disabilities Act, 42 U.S.C. § 12182(b)(2)(A)(ii). Failure to change policies or practices can constitute sufficient evidence that the harm is likely to be repeated when a plaintiff returns to the same establishment. *See Fortyune v. Am. Multi-Cinema, Inc.,* 364 F.3d 1075, 1081-83 (9th Cir. 2004) (holding that a plaintiff who lost the opportunity to watch a movie due to a defendant's seating policy was

5

imminently likely to encounter future harm because the policy continued to exist and plaintiff continued to frequent the theater); *Krpan v. Registry of Interpreters for the Deaf,* 167 F. Supp. 3d 774, 784-85 (E.D. Va. 2016) (plaintiff had sufficiently established that he "suffered or will suffer an actual or imminent injury-in-fact" when plaintiff was told by senior employees that their policy precluded completely Deaf individuals from taking their examination and was denied accommodations that he would need in order to pass).

As Plaintiff states in her proposed Fourth Amended Complaint, BMC had no policies on October 12, 2016, and continues to have no policies, pertaining to the treatment and accommodation of autistic individuals and others with developmental disabilities, or pertaining to BMC's obligations to modify its policies and practices and/or to reasonably accommodate this subset of individuals with disabilities pursuant to the Americans with Disabilities Act (ADA). Fourth Am. Compl. ¶¶ 102-105. In addition, BMC has not provided its employees or contracted workers with training regarding the needs of autistic patients or others with developmental disabilities. *Id.*

BMC cynically claims that S.L. "cannot possibly know what, if any, policy changes BMC has made in the last five years since she has not been there." Although BMC has filed its motion to dismiss at the pleadings stage, rather than as a motion for partial summary judgment, BMC has purportedly provided Plaintiff's counsel with copies of all relevant policies - both from 2016 and current. BMC's claim that Plaintiff "cannot possibly know" what its policies are at this stage in litigation is simply false.

Moreover, since the Court's November decision on standing with respect to the ED Defendants' Partial Motion to Dismiss, Plaintiff has learned - and added to her proposed Fourth

6

Amended Complaint - that the events on October 12, 2016 were not perceived as unusual or problematic by at least two of the professionals who have practiced there on a regular basis since prior to 2016. Fourth Am. Compl. ¶¶ 106, 107. This further bolsters S.L.'s reasonable belief that BMC has not meaningfully added to and/or changed its policies insofar as they impact autistic individuals and others with developmental disabilities and that, as a result, she risks further discrimination if she were to return to BMC. Although discovery is ongoing and Plaintiff intends to seek further information on this matter, she has ample reason to believe that BMC's policies were and remain inadequate to prevent S.L.'s treatment in 2016 from reoccurring, as further discovery may confirm.

In its November 2020 decision granting the ED Defendants' Partial Motion to Dismiss, the Court also notes that, on a prior occasion, S.L. was treated appropriately by a doctor at the BMC ED. Plaintiff included this event in her Fourth Amended Complaint to illustrate that reasonable accommodations were possible. Fourth Am. Compl. ¶¶ 34-38. However, as she explains in her proposed Fourth Amended Complaint, there is reason to believe that this experience is not typical. Indeed, D.L. recalls that the doctor who treated S.L. in 2014 told her that he had "personal experience with autism in his family." Fourth Am. Compl. ¶ 39. Patients in the ED have no choice as to which doctor is available to treat them on any given occasion and the likelihood that S.L. will again be served by a doctor who happens to have personal family experience with autism is low.

**B. Plaintiff is likely to need emergency medical care at BMC in the future.**

Plaintiff's proposed Fourth Amended Complaint also contains updated facts that illustrate the likelihood that she will need emergency care at BMC in the future. Fourth Am. Compl.

¶¶ 89-97, 99-101. Indeed, S.L. has experienced another emergency requiring treatment since the filing of her Third Amended Complaint; she was told by her local emergency medical responders that emergency transportation was available *only* to BMC from her house at that time; her autism puts her at additional risk of needing emergency medical attention; and she has no plans to move away from her current address. Fourth Am. Compl. ¶¶ 93-97, 99-101; *see* Guodong Liu, *et al.*, A Profile on Emergency Department Utilization in Adolescents and Young Adults with Autism Spectrum Disorders, 47 J. Autism & Developmental Disorders 347, 347-58 (2017) (Autistic adolescents and young adults are four times more likely to use emergency departments than non-autistic peers, with especially greater utilization by older autistic adolescents and those in rural areas).

As S.L. has noted in her Fourth Amended Complaint, BMC is the closest hospital to her home. Fourth Am. Compl. ¶ 97. Although not the sole determinant of standing in a Title III case against a hospital, proximity to a hospital is highly relevant, and there need not be any specific plan to seek services from the hospital. *See Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d 636 (D.Md. 2005); *Majocha v. Turner*, 166 F. Supp. 2d 316, 325 (W.D. Pa. 2001); *see also Nanni.*, 878 F.3d at 456 (Title III plaintiff need not have a specific future plan to return to the public accommodation); *Daniels v. Arcade, L.P.,* 477 F. App'x 125, 130 (4th Cir. 2012). *Cf. Schroedel v. New York Univ. Medical Ctr.*, 885 F. Supp. 594 (S.D.N.Y. 1995) (dismissing Title III claim for lack of standing because the defendant hospital was not the closest hospital to the original plaintiff and plaintiff had used the hospital only once in the past ten years, and because the proposed intervenor plaintiff also had not demonstrated that he would need to use the same hospital in the future).

The Court's prior citation to *Aikins v. St. Helena Hospital* is instructive. 843 F. Supp. 1329 (N.D. Cal. 1994). In *Aikins*, the court dismissed a Title III claim against a hospital for lack of standing because the plaintiff had failed to allege sufficiently specific facts establishing her likelihood of returning to the hospital. In response, the plaintiff amended her complaint "to allege that she stayed at her mobile home near the defendant hospital several times a year, considered it reasonably likely that she would seek to use its medical services in the future, and that the hospital engaged in a pattern and practice of denying equal access to the hearing impaired." *Majocha v. Turner*, 166 F. Supp. 2d 316, 325 (W.D. Pa. 2001) (discussing *Aikins v. St. Helena Hospital*, 10 A.D.D. 544, 1994 WL 794959 (N.D. Ca. Apr. 4, 1994) (*Aikins II*)). In light of these additional claims, the court "permitted the claim for injunctive relief to go forward." *Id.*

As in *Aikins II*, S.L. has amended her complaint to reflect that she plans to continue to live near BMC and that, should she need medical transportation, BMC may be her only option for care. Fourth Am. Compl. ¶ 97. Moreover, due to her autism, , S.L. is at heightened risk for needing emergency services and medical transportation. *Id.* at 99; Liu, *et al.*, 47 J. Autism & Dev. Disorders at 347-58. This risk manifested recently when S.L. experienced symptoms consistent with cardiac distress. Fourth Am. Compl. ¶ 93. These symptoms are common in people with PTSD and, because they can be difficult to distinguish from the symptoms of a heart attack, they require urgent medical attention. *Id.* When emergency first responders arrived on scene, they recommended that S.L. be transported to BMC and advised her that they could not transport her to the next closest facility due to weather conditions. Fourth Am. Compl. ¶ 94. The only reason that S.L. was not transported to BMC was because first responders were able to perform tests on-site that ruled out the most life-threatening possibilities; even then, she suffered

harm. *Id.* This incident is particularly relevant in light of BMC's allegation that, in order to establish that she is likely to visit BMC in the future:

> "the following assumptions would have to be made: 1) plaintiff will need emergency care at a hospital; 2) she will need to be taken by ambulance; 3) the illness or injury will be so severe that she will not be able to choose the hospital, and she will have to be taken to the closest emergency department to her home, BMC; 4) that the severe injury that robbed her of her choice of hospital will occur in such proximity to BMC that the ambulance driver must take her there; and 5) that S.L. will remain in the proximity of BMC, despite her turning 18 years old in April 2021 - months before this case is set for trial."

(Doc. 163-1 at 6.)

Nearly every single one of these supposedly implausible eventualities came to pass in the most recent incident. First, S.L. experienced an emergency that, in the opinion of emergency responders, required medical care at a hospital. Fourth Am. Compl. ¶ 94. Emergency responders recommended transportation by ambulance. *Id.* Third, she was not given the option of transportation to another hospital. *Id.* Fourth, the emergency occurred at S.L.'s home, again resulting in BMC being the closest hospital. Fourth Am. Compl. ¶ 93. Fifth, although this emergency occurred when S.L. was a minor, this same situation may recur in the future because S.L. does not plan on leaving her family home upon turning 18 or at any other time in the future. Fourth Am. Compl. ¶ 97.

It is reasonably foreseeable that S.L. will experience a similar emergency in the future. Moreover, in the future, it very well may not be possible to stabilize her and rule out life-threatening causes, making it necessary for her to be transported to BMC. Because panic attacks are marked by heightened anxiety - the very trait that prompted BMC staff to restrain her and forcibly inject her with chemical restraints in 2016 - there is a very real likelihood that she will

10

again experience similar treatment at BMC if she is to return. Similarly, the other subsequent incident in which S.L. required emergency care was an injury to her fingers requiring sutures. In light of BMC's failure to change any of its relevant trainings or practices since 2016, the likelihood that she would encounter a subsequent failure to accommodate her fear of needles and be subjected to discriminatory restraints and forcible medication if she sought care for a future injury at BMC is also high.

*Proctor v. Prince George's Hospital Center*, which BMC cites, is therefore distinguishable from this case. In *Proctor*, the court held that continued policies *alone* were not sufficient to establish standing absent a concrete showing that he was likely to "need to go to PGHC in the future." 32 F. Supp. 2d 830, 833 (D. Md. 1998). Similarly, in *Hoepfl v. Barlow*, the court found that a Title III plaintiff lacked standing when she had already received the surgery she sought from another doctor, had no reason to need the defendant's services in the future, and there was no reason to believe she would "directly benefit" from equitable relief. 906 F. Supp. 317, 320 (E.D. Va. 1995). As noted above, S.L. *has* shown that she is likely to need to go to BMC in the future and, in fact, *has* needed to go to BMC twice since 2016.

The fact that Plaintiff has been prevented from returning to BMC by her well-founded fear of being subjected to similar discrimination does not undermine her standing to pursue injunctive relief. When a Title III entity fails to modify an underlying discriminatory policy or practice, a disabled individual need not engage in a futile gesture of returning in order to establish standing. *Dudley v. Hannaford Bros*. Co., 146 F. Supp. 2d 82, *aff'd*, 333 F.3d 299 (1st Cir. 2003) ("while there is no absolute certainty" of discrimination if the plaintiff sought services again, "likelihood of a denial seems substantial."); *Majocha v. Turner*, 166 F. Supp. 2d 316, 325

11

(W.D. Pa. 2001) (plaintiffs had standing when they were likely to need hospital's services in the future and where "they are prevented from [returning] because defendants steadfastly refuse to alter" relevant policies or practices); *Shaywitz v. Am. Bd. of Psychiatry & Neurology,* 675 F. Supp. 2d 376, 383-85 (S.D. N.Y. 2009) (plaintiff had standing when he had failed an examination without accommodations and could credibly claim that he "would (if he did not think it futile) apply again to be Board certified").

A plaintiff's burden of showing that a subsequent gesture would be futile, at the pleading stage, is low. For example, in *Dudley* the plaintiff had on one occasion sought to purchase alcohol but was refused service because, based on the plaintiff's disability-related features, the manager believed him to be intoxicated.[1] *Dudley*, 146 F. Supp. 2d at 84. Plaintiff was not required to repeatedly attempt to purchase alcohol at the same business in order to establish standing; rather, he was required to allege only that he would *like* to purchase alcohol at the business in the future, but was deterred because he expected that he would be turned away again. *Id.* at 86.

As these cases illustrate, continued exclusion from a public accommodation caused by its failure to comply with the ADA, is, *in itself*, redressable harm. S.L. stands to "directly benefit" from injunctive relief because, if she is confident that she will not face the same treatment she received in 2016, she will once again have the option of seeking medical care at the closest hospital to her home. *Cf. Hoepfl*, 906 F. Supp. at 321.

---

[1] These circumstances are similar to those of S.L., who states in her proposed Fourth Amended Complaint that BMC staff discriminated against her by restraining her and injecting her with an antipsychotic medication based on their belief that she was "psychotic," when in fact S.L.'s appearance in the hallway and apparent severe distress were a manifestation of her severe fear of needles, difficulty communicating, and inability to manage her emotions as a result of her

BMC additionally claims that, in order to obtain injunctive relief, S.L. must show that she will otherwise suffer "irreparable" harm. BMC Memorandum at 5. (Doc. 163-1). This standard is inconsistent with the one set forth by the Fourth Circuit as applied to injunctive relief under the ADA. *Nanni*, 878 F.3d at 456 ("denial of equal access to … goods and services" at a rest stop constitutes sufficient future injury to justify injunctive relief). Although BMC objects that Nanni concerns physical barriers, it cites no case law suggesting that the standard is different in reasonable accommodations cases.

Plaintiff's Fourth Amended Complaint demonstrates plaintiff already has been in need of emergency medical care and yet refused that care because she did not wish to return to BMC's ED and be subjected to discriminatory treatment. Fourth Am. Compl. ¶ 93-97. Since the exact event that Defendant BMC views as hypothetical has occurred, the plaintiff's allegations about returning to BMC's ED move from hypothetical to actual. Since Plaintiff can present clear evidence of the actual likelihood of needing emergency medical care and foregoing getting that care because of the discriminatory treatment she received at BMC's ED, Plaintiff meets the requirements necessary to withstand a 12(b)(6) motion to dismiss.

## IV. CONCLUSION

As set forth in Plaintiff's Fourth Amended Complaint, BMC's written policies, its training materials, and the testimony of practitioners located within the ED all indicate that S.L.'s treatment on October 12, 2016 was consistent with its regular policies and practices. Moreover, S.L. will continue to experience harm if, as a result of BMC's continued failure to institute appropriate policies and re-train its staff, she must repeatedly choose between risking

13

repeated restraint and trauma or foregoing necessary medical care. As a result, BMC's Motion to

Dismiss Plaintiff's First and Related Parts of the Fourth Cause of Action should be denied.

**PLAINTIFF,**
**BY COUNSEL.**

/s/ *Allan N. Karlin*
ALLAN N. KARLIN, WV BAR # 1953
JANE E. PEAK, WV BAR #7213
ALLAN N. KARLIN & ASSOCIATES PLLC
174 CHANCERY ROW
MORGANTOWN, WV 26505
304-296-8266

/s/ *Samantha Crane*
SAMANTHA CRANE, DC BAR # 1000447
AUTISTIC SELF ADVOCACY NETWORK
1010 VERMONT AVENUE, STE 618
WASHINGTON, DC 20005

/s/ *Shawna White*
SHAWNA WHITE, WV BAR # 10893
DISABILITY RIGHTS OF WEST VIRGINIA
1207 QUARRIER STREET
CHARLESTON, WV 25301

## **CERTIFICATE OF SERVICE**

      I, Allan N. Karlin, do hereby certify that on March 19, 2021, I electronically filed, via the CM/ECF system, "Plaintiff's Opposition to BMC'S Motion to Dismiss" on the following:

| | |
|---|---|
| Joshua K. Boggs (WV Bar # 10096) | Tamela J. White (WV Bar # 6392) |
| Christine S. Vaglienti (WV Bar # 4987) | Julian P. Pecora (WV Bar # 13912) |
| Lauren T. Krupica (WV Bar # 11719) | Farrell, White & Legg PLLC |
| West Virginia United Health System, Inc. | 914 5th Avenue, PO Box 6457 |
| 1238 Suncrest Towne Centre Drive | Huntington, WV 25772-6457 |
| Morgantown, WV 26505 | Ph: 304-522-9100 |
| 304-598-9888 | Fax: 304-522-9162 |

                              PLAINTIFF,
                              BY COUNSEL.

/s/ *Allan N. Karlin*
ALLAN N. KARLIN, WV BAR # 1953
JANE E. PEAK, WV BAR #7213
ALLAN N. KARLIN & ASSOCIATES PLLC
174 CHANCERY ROW
MORGANTOWN, WV 26505
304-296-8266